IN THE CIRCUIT COURT OF RANKIN COUNTY, MISSISSIPPI


STATE OF MISSISSIPPI                                    PLAINTIFF

V                                          CAUSE NO. 30643

JEREMY TRAVIS PAIGE                                    DEFENDANT

Charge (s):   Count  I:  Sale of Methamphetamine
              Count II:  Sale of Methamphetamine with Intent


**Motions - Testimony - Guilty Plea**
_____

    **BE IT REMEMBERED** on October 12 & October 26, 2020, that
the above-styled case came on for hearing before the
Honorable John H. Emfinger, and the following proceedings
were held and done, to-wit:
_____



APPEARANCES:

    **JOEY MAYES, ESQUIRE**
    Assistant District Attorney
    Post Office Box 68
    Brandon, Mississippi  39043

        COUNSEL FOR THE PLAINTIFF


    **VICKY L. GILLIAM, ESQUIRE**
    Gatewood & Gilliam, PLLC
    106 Town Square
    Brandon, Mississippi 39042-3134

        COUNSEL FOR THE DEFENDANT







                    REPORTED BY:
            **Harvey J. Rayborn, CCR #1274**
                Official Court Reporter
                Post Office Box 720248
                Byram, Mississippi  39272
                 Cell:  (601) 259-7498
               e-mail:  Raybornhj@aol.com

EXHIBIT 3

# TABLE OF CONTENTS

Style and Appearances ................................. 1

Table of Contents ..................................... 2

Defendant's Exhibits .................................. 3

Proceedings - Motions - Court Dialogue ................ 4

**State's Witness**

**TESTIMONY OF INVESTIGATOR BRETT MCALPIN**

     Direct Examination by Mr. Mayes ................... 6

     Cross-Examination by Ms. Gilliam ................. 12

     Redirect Examination by Mr. Mayes ................ 33

Argument by Ms. Gilliam ............................... 36

Response by Mr. Mayes ................................. 37

No Reply by Ms. Gilliam ............................... 38

Ruling of the Court ................................... 38

Court Dialogue ........................................ 40

Guilty Plea Proceedings ............................... 42

Elements .............................................. 44

Minimum and Maximum ................................... 45

Factual Basis ......................................... 47

Sentencing Proceedings - October 26, 2020 ............. 51

Sentence .............................................. 53

Certificate of Court Reporter ......................... 56

## DEFENDANT'S MOTION EXHIBITS

### October 12, 2020

| EXHIBIT | DESCRIPTION | MARKED | ENTERED |
|---------|-------------|--------|---------|
| Exhibit 1 | Booking Record | 22 | |
| Exhibit 2 | E-mail | 22 | |
| Exhibit 3 | Statement | 29 | |
| Exhibit 4 | Book-In Report | 32 | |
| Exhibit 5 | Booking Photo | 32 | |

<u>P-R-O-C-E-E-D-I-N-G-S</u>

**(Motions - Court Dialogue.)**

**THE COURT:** All right. We're here on Cause Number 30643, State versus Jeremy Travis Paige. Mr. Paige is present with his attorney, Ms. Gilliam. The State's present through Mr. Mayes.

We're here to consider pretrial motions. Let me take a look at several of these. The first motion in limine filed by the State is to not mention the possibility or what possible punishment may be in front of the jury.

Any objection to that, counsel?

**MS. GILLIAM:** No objection, your Honor.

**THE COURT:** All right. It'll be granted.

Mr. Mayes, draft an order to that effect.

**MR. MAYES:** Yes, sir.

**THE COURT:** I have a motion in limine to exclude other crimes.

Does the State intend to introduce any evidence of other crimes or bad acts by this Defendant in its case-in-chief.

**MR. MAYES:** Not in its case-in-chief, no, sir.

**THE COURT:** All right. So does he have prior convictions that you would attempt to use?

**MR. MAYES:** Your Honor, he has three prior convictions one of which is within the last ten years. It is possession of stolen property here in Rankin County.

**THE COURT:** So that will not be brought out in your case-in-chief. If the Defendant elects to testify, then we would have Peterson hearing before that would be

1  mentioned in front of the jury.

2          **MR. MAYES:**  Yes, sir.

3          **MS. GILLIAM:**  Yes, sir.

4          **THE COURT:**  Anything else we need relative to the

5  motion in limine?

6          **MS. GILLIAM:**  No, sir, your Honor.

7          **THE COURT:**  So, counsel, if you will prepare an

8  order granting your motion in limine with the exception of a

9  possible Peterson.

10          **MS. GILLIAM:**  Thank you, your Honor.

11          Your Honor, I filed a motion to compel, but that's

12  been revolved before today thanks to Mr. Mayes giving

13  everything to me.

14          **THE COURT:**  The motion to compel has been

15  resolved?

16          **MS. GILLIAM:**  Yes, sir.

17          **THE COURT:**  Does that mean that all we have left

18  is the motion to suppress?

19          **MS. GILLIAM:**  Yes, sir.

20          **THE COURT:**  All right.  Hang on just a second.

21  It looks like there's witnesses in this case?

22          **MR. MAYES:**  Yes, sir.

23          **THE COURT:**  How many?

24          **MR. MAYES:**  Just one.

25          **THE COURT:**  All right.  Let's let him come up and

26  be seated, okay.

27          **MS. GILLIAM:**  Your Honor, can we sit down over

28  here?

29          **THE COURT:**  Yeah.

1    Counsel, if y'all will clear a space for

2  Ms. Gilliam and her client at counsel table.        .

3    All right.  I see the motion to suppress.

4  It challenges the legality of the stop and I believe that

5  puts the burden on the State to go forward.

6    Any disagreement with that, Mr. Mayes?

7    **MR. MAYES:**  No, sir.

8    **THE COURT:**  All right.  Do you disagree or agree,

9  Ms. Gilliam, the burden is on the State to go forward?

10    **MS. GILLIAM:**  Absolutely not, your Honor.  I think

11  that's right.

12    **THE COURT:**  All right.  Who does the State have

13  first?

14    **MR. MAYES:**  The State calls Brett McAlpin.

15    **THE COURT:**  Mr. McAlpin, let's be sworn.

16                          **BRETT MCALPIN,**

17  having first been duly sworn by the court reporter, was

18  examined and testified on his oath as follows, to-wit:

19    **MR. MAYES:**  May I proceed?

20    **THE COURT:**  You may.

21  **DIRECT EXAMINATION BY MR. MAYES:**

22    Q.  Would you, for the record, would you state your

23  name?

24    A.  Brett McAlpin.

25    Q.  And where are you employed?

26    A.  Rankin County Sheriff's Department.

27    Q.  I call your attention back to August the 1st of

28  2018.  Were you involved in an investigation of Jeremy

29  Travis Paige?

1       A.    I was.

2       Q.    How did his name come into this investigation?

3       A.    We had a CI make contact with Mr. Paige in

4  reference to buying illegal drugs, methamphetamine, from

5  him.

6       Q.    How did he contact?

7       A.    Via telephone.

8       Q.    And was there any kind of arrangements made with

9  him for the purchase of narcotics?

10      A.    Yes.  We initially arranged to purchase

11 approximately $200 worth of methamphetamine from Mr. Paige

12 at the Flying J Truck Stop in Pearl and subsequently

13 Mr. Paige changed that location to the Romantic Adventures

14 there on Highway 80 just west of Old Highway 49.

15      Q.    Did he contact the CI to change that location or

16 did the CI contact him?

17      A.    He contacted the CI, after which we moved our

18 CI.  We moved our CI and our undercover officer to that

19 location and he was later on met by a white female.

20      Q.    You said he was met by a while female.  Who?

21      A.    The CI.  I'm sorry.

22      Q.    Okay.  So a white female came to that location

23 where the CI was told by Mr. Paige to go?

24      A.    That's correct.

25      Q.    Okay.  And what happened after that?

26      A.    Our CI got out and spoke with the driver of the

27 vehicle, which was a white female identified as Ms. Brock.

28 Ms. Brock provided him with a bag that had, like, some glow

29 sticks in it and a couple of bags of what we believed to be

1  methamphetamines.  He gave her --

2      Q.    Have you since had those, the what you believe to

3  be methamphetamine --

4      A.    Yes.

5      Q.    -- tested?

6      A.    Yes.

7      Q.    Did it, in fact, test as methamphetamine?

8      A.    It did.

9      Q.    Do you recall an amount?

10     A.    I don't.  I don't have the crime lab report with

11 me.

12     Q.    Okay.

13     A.    Our CI provided Ms. Brock with the $200 that we

14 had provided to the CI returned back.

15     Q.    Let me stop you.  Was Mr. Paige in the vehicle

16 with Madelyn Brock?

17     A.    No, sir.

18     Q.    Was there anyone else in the vehicle?

19     A.    There were two juveniles, another female and a

20 male.

21     Q.    Okay.  Go ahead.

22     A.    Our CI returned back to the UC vehicle.  We were

23 advised that he had -- he had received the methamphetamine

24 at which time we stopped the suspect vehicle.

25     Q.    Okay.  And describe to me what happened after you

26 stopped that vehicle?

27     A.    When Ms. Brock was taken into custody, she

28 immediately said that she was just delivering a package for

29 Mr. Paige.

1  Q.  Did she specifically say that she was delivering

2  it for the Defendant --

3  A.  That's correct.

4  Q.  -- Jeremy Travis Paige?

5  A.  That's right.

6  Q.  And what did she tell you concerning that?

7  A.  She said after, om, that she was supposed to

8  deliver it and that he was going to give her $50 of the $200

9  that we had provided to her and that she was supposed to

10  meet him back on Pine Park, 220, 220 Pine Park Drive in

11  Pearl where they would, I guess, make their exchange.

12  Q.  And did she actually show you where that house was

13  located?

14  A.  She did.

15  Q.  Did she give you any other information as far as

16  Mr. Paige, what he was driving or anything like that?

17  A.  When we initially arrived at the residence, she

18  said he's not here, he's in a black Nissan that belongs to

19  the homeowner, a Christy Lynn Ivy.  She described it as

20  a black Nissan and it belonged to the homeowner there at

21  220.

22  So what we did is we went ahead and transported

23  her to the jail.  Myself and several other officers remained

24  in the area.  I parked right there at 220 awaiting

25  Mr. Paige's arrival.

26  Q.  Okay.  Did he, in fact, arrive at that location?

27  A.  Later on he did.  He -- he came off of Pine Park

28  Circle and turned onto -- I believe it's Pine Park Drive.

29  I saw the black Nissan.  He was coming up the street at

1  which time I turned my headlights on to try and stop him

2  before he got to the residence.  When I turned on my

3  headlights and came out into the drive, he put the car in

4  reverse and backed up Pine Park Drive and I turned my blue

5  lights on.  He then backed onto Pine Park Circle and then

6  proceeded west on Pine Park Circle out toward Pearson Road

7  where several other units were able to stop him.

8      Q.   Were you able to see the license plate on the

9  vehicle?

10      A.   Yes, sir.  When he turned -- when I turned behind

11  him on Pine Park trying to stop him I could read the tag.

12      Q.   And were you able to confirm that this was, in

13  fact, the vehicle that Madelyn Brock had told you --

14      A.   It did.  The tag number --

15      Q.   -- that he was driving in?

16      A.   -- did come back to -- it came back to Ms. Ivy.

17      Q.   Okay.  So was he stopped after this?

18      A.   Yes, sir.  We had to get him stopped.  We had to

19  stop him there at the intersection of Pine Park Circle and

20  Pearson Road.  We had to pull a patrol car in front of him

21  and -- to try to get him stopped.  But, yes, sir, we were

22  able to get him stopped.

23      Q.   After he was stopped, was there any drugs or

24  anything that was found on him or in the vehicle?

25      A.   Yes, sir.  There was some found in the floorboard

26  of the vehicle and some -- some baggies there in the

27  floorboard.

28      Q.   And was that also submitted to the crime lab?

29      A.   It was.

1    Q.   Do you know if it came back as being

2  methamphetamine?

3    A.   It did.

4    Q.   So I guess to put this in a nutshell, why exactly

5  did you stop him that night?  Why were you stopping Jeremy

6  Travis Paige that night?

7    A.   He was identified by the -- our suspect that we

8  bought the drugs from.  She identified the vehicle.  She

9  identified who the vehicle belonged to.  He was coming to

10 the residence where she said he would be coming to.

11 And then when I tried to stop him, he attempted to elude me.

12 When I saw the tag, it came back matching the information

13 that we had been given by the suspect.

14       **MR. MAYES:**  No further questions at this time,

15 your Honor.

16       **THE COURT:**  All right.  Let me ask a couple of

17 questions before cross-examination.

18       You talked about the CI making contact with

19 Mr. Paige.  Were you able to monitor that?

20    A.   Yes, sir.

21       **THE COURT:**  So law enforcement heard the

22 conversations?

23    A.   Yes, sir.

24       **THE COURT:**  And did they know it was Paige that

25 they were talking to?

26    A.   We -- other than just knowing that that's who she

27 said she was calling.  I -- I -- as far as voice

28 recognition, no, sir, I couldn't identify him by that.

29       **THE COURT:**  But you could hear the arrangements

1  that were being made?

2      A.   Yes, sir.

3      **THE COURT:**  All right.  So were y'all able to have

4  surveillance on the buy?

5      A.   Yes, sir.  I was there and several other people

6  were there.  I was able to keep eye -- visual contact with

7  the CI the entire time during, prior to, during to and --

8  during after the transaction.

9      **THE COURT:**  All right.  Cross-examination.

10      **MS. GILLIAM:**  Thank you, your Honor.

11  **CROSS-EXAMINATION BY MS. GILLIAM:**

12      Q.   Did you record that conversation that you

13  overheard with the CI and allegedly Mr. Paige?

14      A.   Yes, ma'am.

15      Q.   Have you given that to the assistant DA?

16      A.   Yes.

17      **MS. GILLIAM:**  (To Mr. Mayes)  Have you given that

18  to us?  We don't have that.

19      A.   I'm sorry.  I may not.  I -- I'd have to look at

20  my -- I've got my report.

21      Q.   **(By Ms. Gilliam)**  Would you look at that and see

22  if you have that in evidence?  Because we've been told you

23  don't have that, it doesn't exist.

24      A.   Then it's not there.  If the DA's office doesn't

25  have it, it's not there.

26      Q.   Okay.  So you don't have a recording of that

27  conversation between Mr. Paige and the CI?

28      A.   No, ma'am.

29      Q.   Okay.  And so were you independently, were you

1  familiar with the phone number of Mr. Paige or this phone

2  number that the CI was calling?

3      A.   No, I -- I have no knowledge of Mr. Paige's

4  contact information.

5      Q.   Okay.  And have you ever talked to Mr. Paige

6  before?

7      A.   Not that I can recall.

8      Q.   Okay.  So you wouldn't recognize his name or his

9  number -- I mean his voice or his number, correct?

10      A.   No.

11      Q.   Okay.  Now tell me, what was the CI charged with?

12  What had he been arrested for?

13      A.   He's been arrested for several drug charges in the

14  past.

15      Q.   And how did he become a confidential informant?

16      A.   He advised he would like to become a confidential

17  informant to assist us to buy other drugs from people.

18      Q.   Okay.  So did that happen at the point of his

19  arrest or was he sitting in jail when he contacted you?

20  Was he out?  How did he come to contact you to say "I want

21  to be a CI?"

22      A.   Well, that was after-the-fact.  I wasn't familiar

23  with the CI.  He contacted me one day.  I guess he had kind

24  of a dual motivation.  He wanted to get paid.  He was

25  looking to get paid and said he had a criminal past and

26  he wanted to try to do things to try to change his past if

27  you will.

28      Q.   To minimize his sentence?

29      A.   No, ma'am.  I do nothing with a sentence. I had

1    never arrested ███████.

2              **THE COURT:**  So let me make sure I understand.

3    So he didn't have pending charges with you?

4        A.    No, sir.

5              **THE COURT:**  He was not working off a charge

6    I think is what the question is.

7        Q.    **(By Ms. Gilliam)**  That's --

8        A.    Oh.

9        Q.    **(By Ms. Gilliam)**  What --

10       A.    I'm sorry.  Yes, ma'am.  No.  He was -- his

11   primary motivation was money.

12       Q.    To get paid?

13       A.    Correct.

14       Q.    And did you pay him?

15       A.    Yes.

16       Q.    How much?

17       A.    I believe it was $200.

18       Q.    Okay.  And he came to you -- did he come to you

19   with that sale, the alleged sale already ongoing or did you

20   suggest to him, "Hey.  Start?"  Did you watch the whole

21   process?

22       A.    He would've initiated it.

23       Q.    Okay.  So he came to you and said, "Hey, I can

24   make a call.  I can set up a sale?"

25       A.    Correct.

26       Q.    "You give me money?"

27       A.    (Nods head affirmatively.)

28       Q.    Okay.  And was this on the telephone?

29   a conversation? or was this a text?

1    A.    I believe it may have been both.  I don't --

2  I can't -- I don't recall if it was a text or a phone call.

3    Q.    Okay.  Was this a phone that you gave him?

4    A.    No.  It was his phone.

5    Q.    He was using his phone.  Okay.  So did you

6  actually hear him?  If you don't recall, do you actually

7  remember hearing -- overhearing a conversation between him

8  and anybody?

9    A.    That's what I'm saying.  I can remember talking

10  with the CI while he's -- I -- I believe it was both a text

11  and a -- but I could go off of what the CI was telling me.

12    Q.    Were you there with him?

13    A.    Some of the time, yes.  Now when we -- when they

14  moved, when we're in a vehicle I'm in my vehicle and they're

15  in theirs.

16    Q.    So you didn't know -- you weren't recording it so

17  you didn't know if he was texting someone, someone was

18  texting him from a phone on this information or someone

19  called and told him?

20    A.    Correct.

21    Q.    Okay.  So you really don't recall if both of these

22  were texts from a phone?

23    A.    Right.  I could only go off what the CI was

24  telling me.

25    Q.    So that was just information?

26    A.    Correct.

27    Q.    He didn't say phone conversation or text?

28    A.    Correct.

29    Q.    Okay.  So there was a text from a phone number?

1    A.    Again, I don't know if it was a text or a phone

2    call, one of the two.

3    Q.    Okay.  All right.  So once you -- once you

4    arrested Ms. Brock, tell me what she told you again.  What

5    was her statement to you?

6    A.    Once we took her into custody she said I'm just --

7    I don't know -- I was just told to bring this package to

8    him, bringing for -- for Travis.

9    Q.    And where was she when she told you that?  Where

10   were y'all?

11   A.    They were right there at Romantic Adventures.

12   Q.    Okay.  Who else was there when she said that?

13   A.    It would have been several other officers.

14   I believe -- bear with me just a second.

15   Q.    Okay.

16   A.    It would have been Chad Thornton, Luke Stickman,

17   myself and there were several others.  I believe Cody

18   Grogan, James Rayborn and -- and maybe a few more.

19   Q.    Okay.  I just got a report now in the discovery

20   that's from you.  Did any of those other officers turn in a

21   report?

22   A.    No.  This would just be -- it would be my report.

23   No, ma'am, they didn't.

24   Q.    Okay.  Did you feel at that point that you had

25   probable cause to arrest Mr. Paige?

26   A.    At that point?

27   Q.    Yes.

28   A.    No.  I -- I felt I had a probable cause to go

29   investigate what the -- what Ms. Brock had told us.

1  Q.  All right.  Did you have probable cause to arrest

2  him at that point based on what she said?  Do have probable

3  cause to arrest him at that point based on what she said?

4  A.  No.

5  Q.  Okay.  Did you have probable cause at that point

6  to search the home, the address?

7  A.  We didn't search the home until after Mr. Paige

8  was taken into custody.

9  Q.  Did you have probable cause at that point when she

10  told you this information, stopping right there, did you

11  have probable cause to search that home?

12  A.  Not at that particular point, no.

13  Q.  Okay.  All right.  That's all you know.

14  Thank you.

15      Did you have probable cause -- you didn't have

16  probable cause to arrest him and you didn't have probable

17  cause to search the home based on the information that she

18  gave you.  So did you have probable cause to search his car

19  once you found out that he was in a car?

20  A.  What I saw when -- when we stopped him and took

21  him into custody, I could see the -- what I believed to be

22  methamphetamine in plain view in the driver's side

23  floorboard.

24  Q.  Okay.  But before then when you're sitting there,

25  you go to the house, she goes with you to the home and --

26  what happens at the house?  Do you knock on the door?

27  A.  No.  When -- when we go to the home, she's in a

28  marked patrol car, she points out where this house is and

29  says that he is not here and describes what vehicle he would

1    be in.

2        Q.   Okay.

3        A.   We don't go -- we don't make contact with anyone

4    at the home then.

5        Q.   Okay.  And you didn't -- did you take her -- who

6    brought her back to the -- to the jail?

7        A.   I don't know who transported her.  I'd have to

8    look back at the jail records.

9        Q.   All right.  At that point no one came and got an

10   arrest warrant for him or a search warrant for the home,

11   correct?

12       A.   No.

13       Q.   Okay.  And she was, I think, booked in or -- let's

14   see.  I'm sorry.  She was booked in at about 21:30, I think.

15   This is the booking report, I'll mark this as Exhibit A, for

16   Madelyn Brock.  I'll let you look at this.  I know you're

17   familiar with these, aren't you?

18       A.   The booking sheets, yes, ma'am.

19            **MS. GILLIAM:**  You've seen it?  Okay.

20       Q.   **(By Ms. Gilliam)**  I'm trying to set a time line

21   here.  So the sale happened at 19:30, correct?

22       A.   Approximately.  Yes.

23       Q.   Okay.  And she was booked in at 21:34; is that

24   correct?

25       A.   According to this, yes, ma'am.

26       Q.   Okay.  So how long, from the time of the sale to

27   the time that she was booked in, how long had that time,

28   that amount of time was she in the car with you?

29       A.   She was never in the car with me.

1  Q.  Okay.  Was she in the car with someone else?

2  A.  She was transported.  I can't give you an exact

3  time because I didn't transport her.

4  Q.  She went to the house with you, right?

5  A.  She was -- she was -- I followed the patrol car

6  and she pointed the house out and then I was advised that

7  she said he wasn't there and then they went on to, I guess,

8  to the jail.

9  Q.  Okay.  How long do you think it was that you held

10  her there at Romantic Adventures and talked to her?

11  A.  It wasn't very long.  I can't give you an exact

12  time so -- 30 minutes maybe.  We had juveniles we had to get

13  taken care of and et cetera.

14  Q.  Right.  I understand.  Thank you.  When were you

15  told and by whom the kind of car he would be driving?

16  A.  She told us while she was there, while she was --

17  we were following to the house, she explained that he would

18  be in a black Nissan.  She may have mentioned it to me there

19  on the side of the road.  I can't recall exactly.

20  Q.  A black Nissan, and she knew who would be -- who

21  would own that car?

22  A.  Correct.

23  Q.  Okay.  Christy Lynn Ivy?

24  A.  That's what she said.

25  Q.  Okay.  Now other than that, you never went up to

26  the residence and knocked --

27  A.  No.

28  Q.  -- residence and knocked --

29  A.  No.

1    Q.    -- and asked for him?

2    A.    No.

3    Q.    And you didn't come back and get an arrest warrant

4    or have somebody else get an arrest warrant for you, or a

5    search warrant; is that right?

6    A.    For the home?

7    Q.    An arrest warrant for -- an arrest warrant for.

8    Mr. Paige or a search warrant for the home of Christy Lynn

9    Ivy?

10   A.    No.

11   Q.    Now originally didn't she tell you that there

12   would be drugs in that house?

13   A.    I can't recall.

14   Q.    So she -- was she taking you there to find drugs

15   or was she taking you there to find him, Mr. Paige?

16   A.    You'd have to ask her.  She was simply telling us

17   that Mr. Paige is the one who asked her to deliver the

18   package and then she told us where he would be that she was

19   supposed to meet him.

20   Q.    Oh, okay.  So it was really about him?

21   A.    Correct.

22   Q.    Okay.  And at that point, were you looking for him

23   -- I guess you decided to sit and wait and see if he came

24   home --

25   A.    Correct.

26   Q.    -- is that right?  So from the time that you got

27   there until you actually saw him at 21:30, about how long of

28   a time past then?

29   A.    The exact time, I -- I -- I would have to look

1    back at the radio log because I'm sure there's a radio log

2    where I ran the tag that could probably narrow that down.

3        Q.   Do you have a copy of your report?

4        A.   Yes.

5        Q.   If you don't mind looking at that.

6        A.   Okay.  I'm sorry.  It's about 21:30.  That'd --

7        Q.   So at 21:30 --

8        A.   -- be 9:30 p.m.

9        Q.   -- is when you saw a black Nissan Altima turning

10   into Pine Park Drive from Pine Circle?

11       A.   That's correct.

12       Q.   So you were waiting there?

13       A.   Correct.

14       Q.   Okay.  Who was with you as you waited there?

15       A.   There were several patrol units there in the area,

16   the before mentioned officers and I think Pearl PD had some

17   guys there.  There were several patrol units.  I was alone

18   in my vehicle there in front of the residence parked on the

19   shoulder of the road.

20       Q.   Okay.  Did you believe that there was any

21   emergency at that point that would have prevented you from

22   getting an arrest warrant or a search warrant?  Was there

23   anything that was going to happen in an emergent situation

24   that would have caused you a problem if you went and got an

25   arrest warrant and search warrant first?

26       A.   No.  I did not know where Mr. Paige was and based

27   on that information I didn't want to leave the residence

28   unobserved and him be able to come back.  Just a continuance

29   of the investigation based on what she told us, I wanted to

1  speak with Mr. Paige and see if there was any truth to what

2  she was saying.

3      Q.    Okay.  So at what point did you get an arrest

4  warrant for Mr. Paige for the sale?

5      A.    That would have been afterwards.

6      Q.    Do you know when?

7      A.    Presumably within the next morning.

8      Q.    Let me show you this.

9      A.    (Reviewing document.)

10      Q.    **(By Ms. Gilliam)**  Officer, what we've handed

11  you, and we'd like to mark as an exhibit to this hearing,

12  Exhibit 2.  Is that okay?

13          **THE COURT:**  Hang on now.  Let's give these to

14  Harvey.  If you will come and take them and identify what

15  the documents are so Harvey can mark them.

16          **MS. GILLIAM:**  Sure.  Thank you, your Honor.

17          **THE COURT:**  Any objection from the State?

18      **MR. MAYES:**  No, sir.

19      **MS. GILLIAM:**  D1 and D2.

20          (Defendant's Exhibit No. 1, Booking Record,

21  marked.)

22          (Defendant's Exhibit No. 2, Email, marked.)

23      Q.    **(By Ms. Gilliam)**  Detective McAlpin, you've seen

24  the documents I marked as Exhibit 2.  It's an e-mail from

25  Judge McDaniel's court administrator, Ms. Jeffries, you're

26  familiar with her, and it was the affidavit and the warrant

27  for the arrest the next day where it says the only charge he

28  had is this possession with intent; is that correct?

29      A.    That's correct.

1  Q.   Okay.  So you didn't charge him the next day with

2  a sale?

3  A.   No.

4  Q.   Okay.  Why not?

5  A.   He didn't actually sell the -- he didn't sell the

6  drugs to us.  Ms. Brock did.

7  Q.   Okay.  So the sale was added on the indictment?

8  A.   I don't know.

9  Q.   Okay.  I guess my point is, is that you're looking

10 for him all during this time, you're going to a house,

11 you're waiting for him, and at that point you had all the

12 evidence that you were going to have and you still had --

13 you still the next day didn't swear out an affidavit for his

14 arrest for the charge that you're looking for him for,

15 right?

16 A.   I was looking for him for his involvement with the

17 sale.

18 Q.   Right.

19 A.   She had said that he had -- he is the one that she

20 got the drugs from.  So in my interest in investigating the

21 case, I wanted to see if that was indeed true if he did

22 provide her with it, and he did have more.

23 Q.   So you were looking for more drugs too?

24 A.   Correct.

25 Q.   Okay.  All right.  But I think the answer -- my

26 question is at no time, even the next day, did you actually

27 feel like you had probable cause to issue a warrant for his

28 arrest on the sale?

29 A.   For the actual sale?

1  Q. Yes.

2  A. No.

3  Q. Okay.  So you're waiting on him to do what? to

4 stop him and ask him questions or what?  Why --

5  A. Just to confirm --

6  Q. -- are you waiting for him?

7  A. -- the information that we had received.

8  Q. Did you get anymore information?

9  A. No.  He was -- when -- when we made contact with

10 him, he was, for the lack of a better word, he appeared to

11 maybe be under the influence of some type of drug or

12 substance or something.  I don't know.

13  Q. Okay.  So when y'all -- when you saw him, you

14 turned on your headlights.  That's not your blue light, just

15 your headlights?

16  A. That's correct.  I turned my headlights on just to

17 let him know, Hey, I'm sitting here in -- with the

18 anticipation of just stepping out, and, you know, telling

19 him who I was and asking him -- telling him what was going

20 on.

21  Q. At that point when you turned your headlights on,

22 had he committed any offense for which he could be arrested?

23  A. At that point, no.

24  Q. Okay.  All right.  And then when you -- the next

25 thing was you activated your blue lights?

26  A. No, ma'am.  The next thing that happened when

27 I turned my headlights on, he stopped in the middle of the

28 roadway and begin backing up in the center of the roadway at

29 which time that's -- that's a traffic violation.  That's

1  when I activated my blue lights.

2      Q.   All right.  So you're activating your blue lights

3  because he backed up in the road?

4      A.   Yes.

5      Q.   And what would that violation be?

6      A.   He's traveling -- one, he's traveling in the wrong

7  lane of traffic.  He's in the center of the roadway and he's

8  backing up.  He's driving backwards in the center of the

9  roadway.

10      Q.   All right.  And so that would have been a

11  misdemeanor?

12      A.   It would have been a simple traffic violation,

13  yes.

14      Q.   So then when you turned on your blue lights, was

15  it for that reason?

16      A.   Yes.

17      Q.   Were you going to arrest him for backing up in the

18  middle of traffic?

19      A.   I wasn't going to arrest him.  I was going to stop

20  him and just, again, ask him, you know, about the

21  information we had received.  If he had stopped, I would

22  have spoken with him and asked him what was going on and we

23  would have continued from there.

24      Q.   Okay.

25      A.   He didn't do that.

26      Q.   All right.  And so when you actually stopped him,

27  when he stopped, you stopped him, at that point what was

28  your purpose?

29      A.   One, when he backed up, I wanted to stop him for

1    the traffic violation of course.  When I activated my blue

2    lights, he accelerated further backwards and then turned

3    onto Pine Park, I believe that's Pine Park Circle, and

4    accelerated away at a high rate of speed.  We had a couple

5    of other units get behind him, marked patrol units, to try

6    to stop him.  And in order for us to stop him, we had to

7    pull a car in front of him right there at the intersection

8    of Pine Circle and Pearson Road.

9         Q.   Okay.  All right.  So at the point when he stops,

10   what, if anything, did you charge him with?  Did you charge

11   him with something?  What did you charge him with?

12        A.   I hadn't made contact with him right when

13   I stopped him.

14        Q.   Okay.

15        A.   Are you referring to when I actually stopped him

16   or when I approached the vehicle and made contact with him?

17        Q.   Well, when you stopped him, was there anything --

18   was there any reason why you stopped him, any violation of

19   the law when you stopped him?

20        A.   Yeah.  As far as -- yes, ma'am.  For his traffic

21   violations.

22        Q.   Okay.  All right.  And then when you got him out

23   of the car, what happened then?

24        A.   When I approached the vehicle, at first he -- when

25   I was walking up he was -- he was moving around rather

26   violently like he was trying to -- I don't know what he was

27   doing exactly.  When I came up to the vehicle, I noticed he

28   was digging around under the seat.  I knocked on the window

29   to try to get his attention and he refused to comply with

1  making -- acknowledging I was there.  After several attempts

2  to make contact with him, I was able to open the door and he

3  was, like I said, it was very apparent he was not in his

4  right mind if you will.  When I did make contact with him,

5  he begin to actively, for the lack of a better word, fight.

6      Q.   Okay.  Did you throw punches at him?

7      A.   No, ma'am.

8      Q.   Did anybody?

9      A.   I can't -- I -- I was -- when I was dealing with

10  him, he wraps his arm inside the steering wheel and was

11  swinging this arm, you know.  He was hitting me.  Exactly

12  where he was hitting me, I don't know.

13      Q.   Okay.

14      A.   When we got him out, he got taken into custody and

15  there were numerous people there so --

16      Q.   Okay.  Did you handcuff him once you got him out?

17      A.   I did not handcuff him.  Someone did.

18      Q.   Someone did?

19      A.   Yes.

20      Q.   Okay.  And did you take him straight to the jail

21  to be booked in?

22      A.   No.  He said, after we got him in custody and

23  got him calmed down and told him what was going on, and

24  I looked at it, what we had previously mentioned in the

25  floorboard of the car, he said that he could get more, that

26  he needed to go to the house and he could make contact and

27  get more.

28      Q.   Would you look at the -- your report again.

29  In your report, you said, "I was able to access the driver's

1    area." Do you see that? It's on the second page in the

2    middle of that paragraph?

3        A.    Yes.

4        Q.    "I was able to access the driver's area and

5    attempted to remove Paige from the vehicle. Paige begin to

6    actively resist by holding" -- I think that's by, it's a

7    typo, "by holding onto the steering wheel with one arm and

8    waving the other. I, along with assisting deputies, were

9    soon after able to remove Paige from his vehicle where he

10   continued to actively resist by attempting to kick deputies

11   and refusing to place his hands behind his back. I, along

12   with assisting deputies, were able to gain control over

13   Paige and take him into custody."

14            Okay. At that point, was he under arrest?

15       A.    Yes.

16       Q.    Okay. For what?

17       A.    One, he was stopped for a traffic violation and,

18   two, for assault on a law enforcement officer.

19       Q.    Okay. Did you charge him with those things?

20       A.    I don't believe I did. I believe he may have been

21   charged with the disorderly conduct. I'd have to call

22   justice court and find out.

23            **THE COURT:**  Counsel, hang on just a second.

24            **MS. GILLIAM:**  Yes.

25            **THE COURT:**  You mentioned a couple of times there,

26   both in your response and your question, about seeing

27   something in plain view.

28       A.    Correct.

29            **THE COURT:**  At what point in time did you see

1     something in plain view and what was it that you saw?

2        A.   Well, when I walked up to the car, he had his --

3     he had is window up and he was digging around. So,

4     obviously, I looked over and I could see, like, white powder

5     residue and some -- some bags, some little baggies there.

6     Then I was able to open the door. And when I was --

7        **THE COURT:**  So that was before you opened the

8     door?

9        A.   Correct. And while I was dealing with him,

10    once -- now I didn't pay attention to it then, I was more

11    concerned with him, and once we got him out I could see it.

12    It's right there in plain view on the floorboard.

13        **THE COURT:**  All right. I'm sorry, counsel.

14    I didn't understand that.

15        **MS. GILLIAM:**  That's okay, your Honor.

16        I've sort of written on this report. Let me see

17    if I can find a clean copy.

18        The Court's indulgence, your Honor.

19        Your Honor, may I approach?

20        **THE COURT:**  You may.

21        **MS. GILLIAM:**  Okay. I want to mark -- this is his

22    statement. Mark this as Exhibit 3.

23        (Defendant's Exhibit No. 3, Statement, marked.)

24        Q.   **(By Ms. Gilliam)**  Officer McAlpin, on the second

25    page of your report as we were reading along, I stopped

26    before asking you about when you saw the small clear plastic

27    bags. In your original report, you said, "I, along with

28    assisting deputies, were able to gain control over Paige and

29    take him into custody. I then observed the small clear

1  plastic bags containing clear granular substances to believe
2  to be methamphetamine."
3         Now, does that refresh your recollection as to
4  when you first saw the drugs?
5     A.   I actually saw it was when I went up.  The first
6  thing that comes to our minds is, if he's digging under a
7  seat, maybe he's trying to find a weapon, you know.
8     Q.   Okay.  Under the seat?
9     A.   Well, the floorboard and the seat.  So when
10  I walked up and I'm looking and he's frantically moving
11  around in the front floorboard, you could see stuff in the
12  floorboard.
13    Q.   Okay.  But in your report you'll agree with me
14  that your report --
15    A.   Well, yeah --
16    Q.   -- said you then --
17    A.   -- since I --
18    Q.   -- observed it once you got him calmed down and
19  you got in the car and you then observed it.  And then you
20  also have said -- where was it?  You didn't put in your
21  report where you saw it.
22    A.   It was in the front floorboard.
23    Q.   Okay.  Of the?
24    A.   Of the driver's side.
25    Q.   Of the driver's side?
26    A.   Yes, ma'am.
27    Q.   So it was under -- it was under the seat.  That's
28  what you said?  He's --
29    A.   Under the --

1    Q.    -- been fooling around under the seat?

2    A.    -- floorboard or under the seat.  There's a --

3    I guess that area.  Specific points, I couldn't tell you.

4    Q.    Okay.  Now when you approached that vehicle

5    earlier and he was sitting in that seat and his feet were at

6    the -- feet were down at the pedals and he was flailing

7    around and fooling with that, your testimony today is that

8    you actually saw the plastic bags there?

9    A.    I saw -- what I saw like a white residue and some

10   plastic bags or bags that looked like plastic bags.

11   Q.    Okay.  So you returned to the residence at Pine

12   Park Drive with Mr. Paige after that?

13   A.    Correct.

14   Q.    Okay.  And how long did you stay there?  Did you

15   -- did you go get a search warrant or did you just start to

16   search --

17   A.    No, I spoke --

18   Q.    -- the house or --

19   A.    -- I spoke with Ms. Ivy when we went back and she

20   gave us consent to search.

21   Q.    Okay.  And you didn't find anything else there?

22   A.    No, ma'am.

23   Q.    Okay.  No more drugs?  No more paraphernalia?

24   A.    No.

25   Q.    So he was taken back to the house for what reason?

26   to locate drugs?

27   A.    No, ma'am.  He said that he could get -- if we

28   could go back to his house he could contact some people and

29   further, you know, buy more drugs.

1    Q.    And what would that lead to? him helping you make
2    other arrests?

3    A.    I presume so.  Yes.

4    Q.    So after you stayed there, you stayed there an
5    hour or so at his house?

6    A.    Maybe.  I can't recall.  I was speaking with
7    several people while we were there.

8    Q.    Who were those people?

9    A.    I spoke to Ms. Ivy.  I spoke to a -- I can't
10   recall her name, a lady that came up and said she was his
11   friend, or maybe a family member, briefly, and just asking
12   what was going on.  I told her what was going on.  After
13   speaking with her, it wasn't long that we left.  I was told
14   he couldn't make contact with anyone.  We had been there
15   and, you know, Ms. Ivy, and having patrol cars piled up in
16   the street, we just called it off and left.

17   Q.    So you saw -- I know -- the time line shows you
18   saw him at 21:30 is when you marked that.  And then he was
19   booked in at 1:30.  So a couple of hours past?

20   A.    I don't know what time they booked him in.

21            **MS. GILLIAM:**  This is Exhibit 4 and Exhibit 5.

22            (Defendant's Exhibit No. 4, Book-In Report,
23   marked.)

24            (Defendant's Exhibit No. 5, Booking Photo,
25   marked.)

26   Q.    **(By Ms. Gilliam)**  Okay.  Do you recognize that as
27   his book-in report, Exhibit 4?

28   A.    (Reviewing document.)  Yes.

29   Q.    Okay.  And Exhibit 5 is just a photo, the booking

1  photo, but I just made it a little larger so you could have
2  a good look at his face.  Is that the way he looked when you
3  pulled him over?
4      A.  When we pulled him over?
5      Q.  Yes.
6      A.  Yes.  That's, I mean, that's Mr. Paige.  Yes,
7  ma'am.
8      Q.  All right.  So none of the officers there punched
9  him in the face or caused those injuries.  Is that what
10 you're saying?
11     A.  No.  I mean, we had -- we had a pretty good tussle
12 with him.  I mean, he was -- he was fighting pretty hard.
13     Q.  When you went back to the house and you couldn't
14 get the contacts that you wanted, he couldn't make that call
15 or didn't make that call, you didn't rough him up then, did
16 you?
17     A.  No, ma'am.
18     Q.  Okay.  All right.  Thank you.
19         **MS. GILLIAM:**  That's all, your Honor.  Thank you.
20         **THE COURT:**  Redirect.
21 **REDIRECT EXAMINATION BY MR. MAYES:**
22     Q.  Did the CI in this case, I think you said 
23 ?
24     A.  That's correct.
25     Q.  Did he tell you who he had negotiated this sale of
26 methamphetamine with?
27     A.  Yes.
28     Q.  Who did he tell you?
29     A.  Travis Paige.

1    Q.    And when Madelyn Brock showed up to the scene with

2  the meth, who did she tell you sent her to the scene with

3  the meth?

4    A.    Travis Paige.

5    Q.    And who -- and she told you the type vehicle that

6  he would be driving and where he would be going to?

7    A.    Correct.

8    Q.    When you went to that residence and you saw that

9  type vehicle come up there, and I believe in your report you

10  said you could see that a white male was driving it?

11    A.    That's right.  You could see through the

12  streetlights.  Yeah.

13    Q.    And at that point did you feel like you had

14  reasonable suspicion to make an investigatory traffic stop

15  of that vehicle?

16    A.    Yes, sir.

17    Q.    Do you feel like that you had, based on what the

18  CI told you and what Madelyn Brock told you, did you --

19  would you believe at that point in time that you would have

20  had probable cause to arrest this Defendant for a sale that

21  he had set --

22    A.    Yes.

23    Q.    -- up earlier?

24    A.    Yes.

25    Q.    Ms. Gilliam was asking you about when you obtained

26  an arrest warrant and all that.  Could you have gotten an

27  arrest warrant at 7:30, 8:00 o'clock at night?

28    A.    It would have been extremely hard to get one.

29    Q.    Whenever you were affecting the arrest of

1  Mr. Paige, was he actively resisting, fighting the officers

2  that were trying to detain him?

3      A.   Yes, sir.  He was kicking and I guess you could

4  say flailing his arms if you will.  I mean, we had to

5  forcibly -- we had to pull him from the car.  I mean,

6  I wasn't able to pull him out of the car by myself.  I had

7  to forcibly pull his arm off the steering wheel while he's

8  swinging and kicking and he -- he was -- he was -- he was

9  pretty violent, yes.

10     Q.   Prior to that actually happening, though,

11 I believe you testified that you could actually see what

12 later turned out to be methamphetamine on the floorboard of

13 the vehicle --

14     A.   Right.  When --

15     Q.   -- before he actually --

16     A.   -- I walked up -- when I walked up and -- he's --

17 the vehicle is actually almost shaking if you will.  With

18 him moving around, I walk up and look over, you know.  I was

19 concerned.  I didn't want to get shot.  I mean, yes, you can

20 see him down there -- you can see him moving around and you

21 can see the white residue and the little bags, what

22 I considered little plastic bags down there.

23     Q.   And after he was arrested, after he was detained,

24 then did you collect that evidence from the car?

25     A.   Yes, sir.  That was Exhibit 2.

26         **MR. MAYES:**  No further questions, your Honor.

27         **THE COURT:**  All right.  You may step down.

28         (Witness exits witness stand.)

29         **THE COURT:**  Who does the State have next?

1  **MR. MAYES:**  No further witnesses, your Honor.
2  Just argument.

3  **THE COURT:**  Any testimony on behalf of the
4  Defendant?

5  **MS. GILLIAM:**  No, sir.

6  **THE COURT:**  Okay.  I'll hear you in argument in
7  support of your motion.

8  **(Argument by Ms. Gilliam)**

9  **MS. GILLIAM:**  Your Honor, in our argument we tried
10  to preserve exactly what he thought at which time he never
11  believed he had probable cause to arrest him on the sale so
12  he conducted an investigatory stop.  And after he got him
13  under control and he was of no danger anymore, he then, in
14  his report said, "I then saw the substance."

15      I really believe -- I really believe, your Honor,
16  if he had seen it and it was in plain view any time before
17  he had gotten into custody he would have written it in his
18  report, and I think that now he knows what he's got to say.
19  He knows he needs to say, "Oh, I saw it before."  But even
20  when he was testifying, he kept saying he was fumbling
21  under his seat.  That's what he was saying until he started
22  talking about plain view, and I'd go with list report.

23      I think there is an issue of fact here that
24  I think should go to the Defendant and the fact that while
25  this was an investigatory stop there was no probable cause
26  for an arrest on the sale.  He gets him out.  He still -- he
27  -- he didn't say -- even if it was xxx to the arrest he's no
28  longer.  This is not inventory and he's no longer at the car
29  so it doesn't prove any danger.

1    So I think what happened was he gets in the
2  car.  He finds the drugs.  He never says in his report
3  "I found it under the seat;" nor does he say "I found it on
4  the floorboard" or "I found it on the front passenger
5  seat."  He didn't say plain view and I just want the Court
6  to consider that, make the record, your Honor, please,
7  for -- for any appeal that we may have to take.  Thank
8  you.

9          **THE COURT:**  All right.  State respond.

10         **(Response by Mr. Mayes.)**

11         **MR. MAYES:**  Yes, sir, your Honor.  Based on the
12 facts that's through the testimony, there was ample probable
13 cause to arrest this Defendant for the sale based on the
14 fact that negotiations were made with this Defendant on the
15 sale from a confidential informant.  When the codefendant,
16 Madelyn Brock, shows up to the scene and completes the sale,
17 she tells law enforcement that this Defendant is who gave
18 her the drugs and directed her to come there.

19         Probable cause existed for the arrest:  The
20 description of the vehicle, where the vehicle was going to,
21 and later that night that vehicle matching that description
22 registered to person that they said owned the vehicle, that
23 he was coming to the location, and based on those and
24 quoting from Wallace v State, 2019 Mississippi Court of
25 Appeals, "An investigatory stop is only permissible when an
26 officer has reasonable suspicion grounded in specific and
27 articulable facts that a person they encounter was involved
28 is -- or is wanted in connection with a felony, or as long
29 as the officer had some objective manifestation that the

1  person stopped is or is about to be engaged in criminal

2  activity," and that is actually quoting from Floyd at 749

3  So.2d.

4       The Mississippi Supreme Court has held that

5  reasonable suspicion for an investigatory traffic stop may

6  be obtained through an officer's personal observation or an

7  informant's tip if it bears indicia of reliability.  So they

8  had reasonable suspicion to make an investigatory stop of

9  that vehicle.

10       And how do you even go behind that?  They've got

11  probable cause to make that stop. After the stop occurred,

12  Officer McAlpin  testified he saw, before they even started

13  trying to get him out because he was looking for possibly a

14  weapon, could see what appeared to be drugs in the

15  floorboard.  And even if he didn't see it then, they had

16  probable cause to arrest him for the sale.  He was arrested

17  and then, even if he hadn't seen it before, the drugs would

18  have still been located in vehicle and it would still --

19  there's nothing -- no violation.  Not an illegal stop.

20  There's no violation of the Fourth Amendment rights here and

21  the State would ask that the motion to suppress would be

22  denied.

23       **THE COURT:**  Reply?

24       **MS. GILLIAM:**  No, your Honor.

25       **(Ruling of the Report.)**

26       **THE COURT:**  All right.  I believe, based upon the

27  information the officer had and a combination of things,

28  Number (1)  The original sale that was set up by the CI,

29  I believe his last name's ▮▮▮▮, information was given

1  there.  I don't know -- he identified the Defendant as the
2  person he contacted.  I don't know anything about the
3  credibility of the CI.  I don't know anything about prior
4  history of the CI.  So I would be hesitant to base it just
5  upon what the CI said.
6          But following that, people showed up on the scene.
7  A buy was actually made.  And then the person who was
8  stopped, after the buy was made, identified the same person
9  as had been identified by the CI as being responsible for
10  setting up the deal and sent her there to make the sale and
11  she went further and showed them where he should be, told
12  them what kind of car he would be driving, and at that point
13  in time additional information that was -- corroborated with
14  the original CI.  But then we still don't know much about
15  Brock and her credibility.
16          But, in any event, then the Defendant shows up
17  driving the vehicle that the CI -- I mean that Brock had
18  identified, and he ran the tag.  It belonged to the person
19  that Brock said it would belong to.
20          And then further, at that point, apparently
21  Mr. Paige committed a traffic violation in trying to perhaps
22  get away from law enforcement after they were seen.
23  At that point in time, he initiated a stop, a traffic stop,
24  according to the officer's testimony, for the traffic
25  violation.  Whether he had -- he may well have had probable
26  cause at that point to make an arrest, certainly he had a
27  probable cause for a Terry stop.
28          But then with the traffic violation, he goes up
29  and the Defendant's noncompliant to his commands and at that

1 point in time he couldn't get the Defendant to respond and

2 certainly had the ability then to open the door and having

3 to try to, for officer's safety, get the Defendant out of

4 the car.  And whether he saw the material before or whether

5 he saw it after, certainly, under the totality of the

6 circumstances, there was probable cause both to arrest the

7 Defendant for the traffic violation and the sale and the

8 motion to suppress will be denied.

9        All right. The State will draft an order to that

10 effect.

11        **MR. MAYES:**  Yes, sir.

12        **(Court Dialogue.)**

13        **THE COURT:**  Anything else we have at this point on

14 this case?  Anything from the State?

15        **MR. MAYES:**  Yes, sir.  We do have one more thing.

16 Under the Rules of Criminal Procedure, 14(b)(2), as far as

17 enhanced punishment for a subsequent offense is where it

18 requires, after indictment and at least 30 days before trial

19 or entry of a guilty plea, to file with the Court formal

20 notice of such prior convictions, and then it lists what is

21 required in the paragraph above.

22        January the 24th of this year, notice was given to

23 the Defendant when he was given Rule 609 that listed the

24 three prior felony convictions of this Defendant.  And then

25 at the time that that was served on the Defendant also given

26 to him was a copy of the judgment of conviction out of Hinds

27 County for receiving stolen property, which lists the cause

28 number, the sentence, what he was sentenced to and what he

29 was charged with, and then also an additional one for the --

1  out of the First Judicial District of Hinds County where he

2  was charged with a sale of marijuana that lists the cause

3  number as well as what he was charged with.  And based on

4  that and what is required under 14.1(b)(2), that the State

5  has given the appropriate notice that would put him on

6  notice that would make him a subsequent as well as a

7  habitual offender.

8          **MS. GILLIAM:**  He wants to plead open.

9          **THE COURT:**  Is a motion or something that you say

10  is filed for me to rule on.

11          **MR. MAYES:**  It was not a motion, but I believe the

12  nature of what Rule 14.1(b)(2) calls for was met.

13          **THE COURT:**  So is there a notice that you're

14  alluding to?

15          **MR. MAYES:**  There was a notice under Rule 609

16  which listed priors --

17          **THE COURT:**  What date was that filed?

18          **MR. MAYES:**  That was filed January the 24th of

19  this year, well outside the 30 days.

20          **MS. GILLIAM:**  Your Honor --

21          **THE COURT:**  Hang on just a second.  Let me look at

22  it.

23          **MR. MAYES:**  Your Honor, I think you --

24          **THE COURT:**  All right.  You're saying for --

25          **MR. MAYES:**  -- may even be able to avoid having

26  hear this.

27          **THE COURT:**  -- 404(b) and also 609 on January the

28  24h?

29          **MR. MAYES:**  Yes, sir.

1    **THE COURT:**  All right.  You can respond.

2    **MS. GILLIAM:**  Thank you, your Honor.  Before you

3    rule, the client has indicated to me that he'd like to have

4    an open plea, give an open plea.

5    **THE COURT:**  All right.  I'm going to let y'all

6    talk about that for a minute and I'm going to take about a

7    ten-minute break.

8         (Off the record.)

9         (A short recess was taken.)

10        (On the record.)

11        **(Guilty Plea Proceedings.)**

12    **THE COURT:**  All right.  We're here in Cause Number

13   30643, State versus Jeremy Travis Paige.  You're Mr. Paige;

14   is that correct?

15   A.   Yes, sir.

16    **THE COURT:**  Mr. Paige, you've been sworn now so the

17   answers you give will be sworn answers under the penalty of

18   perjury.  Do you understand that?

19   A.   Yes, sir.

20    **THE COURT:**  You filed a petition to enter a plea

21   of guilty to Count II.  What will happen with Count I?

22    **MR. MAYES:**  It will be nolle prossed.

23    **THE COURT:**  All right.  In the petition you

24   indicate that your Social Security number was ███████████;

25   is that correct?

26   A.   Yes, sir.

27    **THE COURT:**  Your date of birth is ████████████

28   ████████?

29   A.   Yes, sir.

1        **THE COURT:**  You finished nine years of school and

2  you're able to read and write; is that correct?

3     A.   Yes, sir.

4        **THE COURT:**  Are you under the influence of any

5  drugs or alcohol hear today?

6     A.   No, sir.

7        **THE COURT:**  Have you ever been treated for any

8  mental disease or disorder?

9     A.   No, sir.

10        **THE COURT:**  Did you read and sign this petition to

11  enter a plea of guilty?

12     A.   Yes, sir.

13        **THE COURT:**  Do you understand everything in the

14  petition?

15     A.   Yes, sir.

16        **THE COURT:**  Is everything in this petition true

17  and correct?

18     A.   Yes, sir.

19        **THE COURT:**  Have you had an opportunity to discuss

20  with your attorney all the facts and circumstances related

21  to the crime that you're offering to plead guilty to?

22     A.   Yes, sir.

23        **THE COURT:**  Did your discussions with your

24  attorney include any possible defenses that you might have

25  to this charge?

26     A.   Yes, sir.

27        **THE COURT:**  Did your discussions with your

28  attorney also include the elements of the crime?

29     A.   Yes, sir.

1    **(Elements.)**

2    **THE COURT:**  Those elements are these as it

3    relates to Count II:  That on or about August the 1st, 2018,

4    in Rankin County, you did unlawfully, willfully, knowingly,

5    feloniously and intentionally possess, with intent to

6    sale,  distribute or transfer, 2 grams but less than

7    10 grams of methamphetamine, a Schedule II controlled

8    substance.

9         Do you understand those elements?

10   A.   Yes, sir.

11   **THE COURT:**  Do you understand that you have a

12   right to be represented by an attorney at all critical

13   stages of the proceedings against you?

14   A.   Yes, sir.

15   **THE COURT:**  You also have a right to a speedy and

16   public trial by a jury and at that trial you'll be presumed

17   to be innocent.  Do you understand that?

18   A.   Yes, sir.

19   **THE COURT:**  Should you go to trial, before you

20   could be found guilty and sentenced, each of the 12 jurors

21   would have to believe, beyond a reasonable doubt, that

22   you're guilty before you could be found guilty.  Do you

23   understand that right?

24   A.   Yes, sir.

25   **THE COURT:**  So if you were to go to trial, you'd

26   have the right to confront and cross-examine all the

27   witnesses called to testify against you and you'd have the

28   right to subpoena witnesses to testify on your own behalf.

29   Do you understand that?

1     A.   Yes, sir.

2     **THE COURT:**  You have a right to remain silent

3 which means nobody can force you or compel you to give

4 evidence against yourself.  Do you understand that right?

5     A.   Yes, sir.

6     **THE COURT:**  So if you were to go to trial, you'd

7 have the right to either testify or not to testify and that

8 choice would be yours.  If you chose not to testify and you

9 asked me to do so, then I would instruct the jury that no

10 adverse inference could be drawn by you exercising your

11 right to remain silent.  Do you understand that?

12     A.   Yes, sir.

13     **THE COURT:**  If you were to go to trial and the

14 jury's verdict were to be against you, you would have the

15 right to an appeal.  If you couldn't afford the cost of that

16 appeal, that cost, plus the cost of your attorney, would be

17 paid for you by the State.  Do you understand that?

18     A.   Yes, sir.

19     **THE COURT:**  Do you understand that by pleading

20 guilty you're waiving or giving up all of these rights and

21 all those rights that are set out in your petition?

22     A.   Yes, sir.

23     **THE COURT:**  Are you telling me then that that's

24 what you want to do, you want to waive all these rights and

25 proceed with your plea of guilty?

26     A.   Yes.

27     **(Minimum and Maximum.)**

28     **THE COURT:**  Do you understand the minimum and

29 maximum punishment the could be imposed for the crime that

1    you're offering to plead guilty to?

2       A.   Yes, sir.

3       **THE COURT:**  The minimum period of incarceration is

4    three years.  The maximum period of incarceration is 20

5    year.  The minimum fine is zero dollars and the maximum fine

6    is $250,000.  Do you understand that?

7       A.   Yes, sir.

8       **THE COURT:**  Do you have any prior felony

9    convictions?

10       A.   Yes, sir.

11       **THE COURT:**  It says two in your petition.  Is that

12    all that you have?

13       A.   Yes, sir.

14       **THE COURT:**  When was the last one?

15       A.   2014.

16       **THE COURT:**  So in August of '18, were you on

17    probation or parole?

18       A.   Yes, sir.

19       **THE COURT:**  Do you understand that if you commit a

20    new crime while -- a new felony while you're on probation or

21    parole that may result in a revocation?

22       A.   Yes, sir.

23       **THE COURT:**  Are you also aware that if you are,

24    in fact, revoked that any sentence would have to run

25    consecutively to any sentence in this case?

26       A.   Yes, sir.

27       **THE COURT:**  And knowing those things, do you still

28    wish to go forward with your plea?

29       A.   Yes, sir.

1    **THE COURT:**  Do you have any other felony charges

2    presently pending?

3        A.   No, sir.

4            **THE COURT:**  What's the factual basis?

5            **MS. GILLIAM:**  Your Honor, I think that we have

6    three.  It's two receiving?  Two receiving?

7        A.   I think two.

8            **MR. MAYES:**  There's a sale of marijuana in Hinds

9    County, a receiving stolen property in Hinds County and a

10   possession of stolen property in Rankin County so there's

11   actually three.

12           **MS. GILLIAM:**  It's actually three, your Honor.

13           **THE COURT:**  Well, that's all right.  But the main

14   thing is, I wanted to know, was when was the most recent and

15   whether he was on probation or parole and I think he's

16   answered that.

17           **MS. GILLIAM:**  And I think you've already done --

18       A.   Yes, sir.  I did the parole violation in 2018.

19           **THE COURT:**  So you are already revoked for this?

20       A.   Yes, sir.

21           **THE COURT:**  Okay.  So I don't know that.  I just

22   need to make sure that you're aware of that.

23       A.   Yes, sir.

24           **(Factual Basis.)**

25           **THE COURT:**  All right.  What's the factual basis?

26           **MR. MAYES:**  The State would prove that on or about

27   August the 1st, 2018, while in Rankin County, that this

28   Defendant did unlawfully, willfully, knowingly, feloniously

29   and intentionally possess, with intent to sell, distribute

1   or transfer, a quantity of 2 grams but less than 10 grams of

2   methamphetamine, a Schedule II controlled substance.

3        **THE COURT:**  Do you have any disagreement with that

4   factual basis, Mr. Paige?

5        A.   No, sir.

6        **THE COURT:**  Counsel, do you have any disagreement

7   with the factual basis?

8        **MS. GILLIAM:**  No, sir.

9        **THE COURT:**  Mr. Paige, has anyone used any

10  threats, force or intimidation in an effort to get you to

11  change your plea from not guilty to guilty?

12       A.   No, sir.

13       **THE COURT:**  Has anyone made you any promises of

14  leniency in an effort to get you to change your plea?

15       A.   No, sir.

16       **THE COURT:**  After discussions with your attorney,

17  are you the one that decided to plead guilty?

18       A.   Yes, sir.

19       **THE COURT:**  Are you telling me then that you're

20  freely and voluntarily admitting your guilt to this crime?

21       A.   Yes, sir.

22       **THE COURT:**  And are you pleading guilty because

23  you are guilty and for no other reason?

24       A.   Yes, sir.

25       **THE COURT:**  Do you understand that this is an open

26  plea which means there's no recommendation from the State as

27  to sentence?

28       A.   Yes, sir.

29       **THE COURT:**  Instead, I'll order a presentence

1  investigation report be prepared and we'll back into court

2  and we'll go over that report and I'll hear from you, I'll

3  hear from the State and then I'll impose a sentence that

4  I think is appropriate up to the maximum authorized by law.

5  Do you understand that?

6      A.   Yes, sir.

7          **THE COURT:**  And knowing that, do you still wish to

8  go forward with your plea?

9      A.   Yes, sir.

10          **THE COURT:**  Is there a claim for restitution?

11          **MR. MAYES:**  No, sir.

12          **THE COURT:**  Do you understand if I accept your

13  plea of guilty that you will not have a right to appeal this

14  conviction?

15      A.   Yes, sir.

16          **THE COURT:**  You've been represented by

17  Ms. Gilliam.  Are you satisfied with her representation?

18      A.   Yes, sir.

19          **THE COURT:**  Do you have any complaints you wish to

20  make about your attorney?

21      A.   No, sir.

22          **THE COURT:**  Do you have any questions about your

23  rights or any questions about the crime that you're offering

24  to plead guilty to?

25      A.   No, sir.

26          **THE COURT:**  Because the bottom line is it's not

27  too late at this point to stop the hearing and proceed to

28  trial, but it will be once I accept your plea of guilty.

29  So before I do that I want to make sure that this is what

1  you want to do.  Do you want to plead guilty?

2      A.   Yes, sir.

3           **THE COURT:**  Any questions?

4      A.   No, sir.

5           **THE COURT:**  How do you plead to possession of more

6  than 2 but less than 10 grams of methamphetamine, a Schedule

7  II controlled substance, with intent to distribute as

8  charged in Count II of Cause Number 30643, guilty or not

9  guilty?

10     A.   Guilty, sir.

11          **THE COURT:**  Counsel, do you know of any reason why

12 his plea of guilty should not be accepted?

13          **MS. GILLIAM:**  No, sir.

14          **THE COURT:**  Mr. Paige, I find that your plea of

15 guilty is freely, voluntarily, knowingly and intelligently

16 made and entered.  I further find it has a factual basis.

17 Therefore, I'm going to accept your plea of guilty and

18 adjudicate you to be guilty of possession of more than

19 2 but less than 10 grams of meth, with intent to distribute,

20 as charged in Count II of this cause.  A Judgment of

21 Conviction will be entered against you.

22          I'll order a presentence investigation report be

23 prepared.  Sentencing will be set for 1:00 o'clock next

24 Monday, and you will be remanded in the custody of the

25 sheriff to await sentencing.

26     A.   Yes, sir.

27          **THE COURT:**  Anything else on behalf of the

28 Defendant at this time?

29          **MS. GILLIAM:**  No, sir, your Honor.

1      **THE COURT:** Anything else from the State?

2      **MR. MAYES:** No, sir, your Honor.

3      **THE COURT:** See you next Monday.

4      (End of Proceedings.)

5      **(Sentencing Proceedings of October 26, 2020.)**

6      **THE COURT:** All right. We're here on Cause Number

7 30643, State versus Jeremy Travis Paige. Mr. Paige is

8 present with counsel. The State's present through the DA's

9 office.

10      Mr. Paige previously appeared before the Court and

11 entered a plea of guilty to --

12      **MS. GILLIAM:** Possession with intent, judge.

13      **THE COURT:** Well, I'm looking for the judgment of

14 conviction.

15      **MS. GILLIAM:** Okay.

16      **THE COURT:** Do you show a judgment of conviction?

17      **COURT CLERK:** October 16th. It should be in

18 there.

19      **THE COURT:** I see it. You entered a plea of

20 guilty to possession of more than 2 grams but less than

21 10 grams of methamphetamine with intent to distribute as,

22 charged in Count II. This was an open plea. Sentencing was

23 put off until today for me to obtain a presentence report

24 which I now have before me.

25      Counsel, have you gone over the report with

26 Mr. Paige?

27      **MS. GILLIAM:** Yes, I have, your Honor, and on the

28 prior convictions, if you'll notice, there is a bunch of

29 them together in Hinds County. Jeremy had talked to me and

1 we had looked at what was pulled up on the criminal record.

2 All those in 2010 were run concurrent and he thought he had

3 pled to the -- what he was going in for was the receiving

4 stolen property.

5       This is the first time we've seen a list like this

6 where it looks like they were all run concurrent. So I had

7 only seen that judgment of conviction on that receiving.

8       Mr. Mayes, do you know anything about that?

9       **MR. MAYES:** I was only aware of three convictions.

10       **MS. GILLIAM:** That -- it's the same thing. See

11 that receiving in the middle in Hinds? That's what he

12 thought he had when he went into prison and now when they

13 pulled it down, see, they're showing everything he was

14 originally charged with and I don't know which one's right.

15       **THE COURT:** Well, Ms. Gilliam, to be honest with

16 you, it not unusual for defendants to think when they're all

17 run together and it's done at the same time --

18       **MS. GILLIAM:** Right.

19       **THE COURT:** -- that there's only one conviction;

20 although, there may be 1, or it may be 437.

21       **MS. GILLIAM:** That's right, your Honor. And we

22 just wanted to say that because he wanted you to know when

23 we were here the other day that's really what he thought.

24 So, it is what it is.

25       **THE COURT:** All right. Any other modifications,

26 changes, corrections or anything of that nature that you

27 would like to suggest from the report from the Defendant's

28 perspective?

29       **MS. GILLIAM:** No, your Honor.

1    **THE COURT:**  Mr. Mayes, have you gone over the

2  report?

3    **MR. MAYES:**  I have.

4    **THE COURT:**  Any modifications, corrections or

5  anything of that nature that you would like to suggest from

6  the State's perspective?

7    **MR. MAYES:**  No, sir.

8    **THE COURT:**  All right.  I'm ready to go forward

9  with sentencing and I'll hear anything on behalf of the

10  Defendant.

11    A.  Yes, sir.  I'd just like to apologize for my

12  wrongdoings.  I accept my wrongdoings, sir, and I just want

13  to thank God right now for the chance of me getting my -- my

14  sobriety back, your Honor, because I was strung out on drugs

15  and that was my fault.  I would just like to say I'm sorry

16  upon the Court.

17    **THE COURT:**  All right.  Anything else on behalf of

18  the Defendant?

19    **MS. GILLIAM:**  No.

20    A.  No, sir.

21    **THE COURT:**  Anything else from the State?

22    **MR. MAYES:**  No, sir.

23    **(Sentence.)**

24    **THE COURT:**  All right.  Mr. Paige, I hope that

25  you're truthful and I hope that that continues.

26    A.  Yes, sir.

27    **THE COURT:**  It looks like you've got two children

28  that needs you to be supporting them --

29    A.  Yes, sir.

1    **THE COURT:**  -- but you can't do that if you're not

2    in your right mind --

3    A.   That's right.

4    **THE COURT:**  -- and on the right side of the law.

5    A.   Yes, sir.

6    **THE COURT:**  Based upon your prior felony

7    convictions though, it'll be the sentence of the Court that

8    you serve five years in the custody of the Mississippi

9    Department of Corrections.

10    I'll order that you pay court costs, fees and

11    assessments in the amount of --

12    **COURT CLERK:**  $458.50.

13    **THE COURT:**  -- $458.50, and a fine of $1,000,

14    all within six months after your release from incarceration

15    and --

16    A.   Yes, sir.

17    **THE COURT:**  -- a 300-dollar crime lab fee.

18    Have you had drug and alcohol treatment?

19    A.   Yes, sir.  Incarcerated, I have, sir.  I've not

20    had none in -- in -- in the world, I haven't, sir.  But in

21    incarceration, I have.

22    **THE COURT:**  When and where did you have that?

23    A.   In Pike County, sir, at a satellite in Pike

24    County.

25    **THE COURT:**  When?

26    A.   In 2016.

27    **THE COURT:**  How long have you been incarcerated

28    now on this charge?

29    A.   A year and two days.  A year and two months.

1    **THE COURT:**  I would put you -- apparently, they've

2  got a new program in Greenwood that's supposed to be better

3  than what they've had before, but you don't have -- you're

4  going to be parole eligible before you could ever complete

5  that program.

6       A.   Yes, sir.  I plan on going when I get out, sir.

7       **THE COURT:**  All right.  Well, I hope I don't see

8  you back here under these circumstances.  Good luck to you.

9       A.   Thank you, Judge Emfinger.

10       **MS. GILLIAM:**  Thank you, judge.

11       (End of Proceedings.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

# CERTIFICATE OF COURT REPORTER

I, Harvey J. Rayborn, Court Reporter and Notary Public in and for the County of Hinds, State of Mississippi, hereby certify that the foregoing 55 pages, and including this page, contain a true and correct transcript of the above styled case, as taken by me in the aforementioned matter at the time and place heretofore stated, as taken by stenotype and later reduced to typewritten form under my supervision by means of computer-aided transcription.

I further certify that under the authority vested in me by the State of Mississippi that the witness was placed under oath by me to truthfully answer all questions in this matter.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest monetary or otherwise, in the final outcome of this proceeding.

Witness, my signature and seal this 19th day of April, 2021.

*Harvey J. Rayborn*
_____
Harvey J. Rayborn, CSR #1274

My commission expires:  10/25/2024