**Countywide Law Enforcement Agencies'**
**Use of Force Policies and Procedures**
**Rankin County, Mississippi**

| **Subject:** Use of Force: Deadly and Less Lethal Force | **Policy Number:** 4.1 |
|---|---|
| **Adoption Date:** February, 2005 | **Revision Date:** February, 2008 |

**Approval Authorities:** Rankin County Sheriff's Department, Brandon Police Department, Florence Police Department, Flowood Police Department, Jackson Municipal Airport Authority Police Department, Pearl Police Department, Pelahatchie Police Department, Reservoir Patrol, Richland Police Department

**POLICY:**

Human life is sacred. Protecting human life is the most important mission of this agency. Apprehending criminals is less important than protecting innocent human life, including the Officer's own life.

Officers will maintain a constant readiness and ability to act in instances where, in *their perception*, the use of force or deadly force may be appropriate. By maintaining readiness and capacity, Officers reduce the likelihood of opposition and of the actual need for a forceful response of any kind. While *Officer discretion* is critical, the need for accountability and control of law enforcement activities is necessary to prevent potential abuses of authority. Officers will only use the amount of force reasonably necessary to protect life and enforce the law under guidelines established in this policy manual (MSLEAC 1.3.1).

**DEFINITIONS** (MSLEAC 1.3.2)**:**

*Authorized weapon*: A weapon approved by the department for sanctioned use by its Officers. No weapon will be authorized for carry or use by an Officer unless the agency expressly approves it and the Officer has demonstrated proficiency with the weapon type in accordance with agency guidelines.

*Baton or expandable baton*: An impact weapon capable of inflicting bodily injury by striking with a portion of the weapon. Only batons authorized by the department are authorized for carry and use.

*Chemical weapon*: A weapon capable of temporarily incapacitating a person through the controlled release of some chemical irritant or agent.

EXHIBIT 6

*Certification with weapon:* The Officer has demonstrated proficiency with a particular weapon and been tested in it=s safe care and use. The Officer is thereby authorized to carry and use this weapon in the performance of his official duties regardless of whether the Officer is on-duty or off-duty. Without such certification, the Officer will not carry or use this or a similar weapon.

*Deadly force*: An action, with or without the use of a weapon, intended to cause death or serious bodily injury; or, the use of any object in a manner intended to cause death or serious bodily injury.

*Electronic weapon:* A weapon using small bursts of electrical energy to temporarily incapacitate a person.

*Firearm*: Any device designated, made, or adapted to expel a projectile through a barrel by using energy generated by rapidly expanding gases, or any device readily convertible to that use; including all handguns, rifles, and shotguns.

*Force, non-deadly force, or less-lethal force:* Actions not calculated under the circumstances to cause death or serious bodily injury.

*Physical strength and skill:* Any physical actions by one or more Officers (e.g., holding, restraining, pushing, and pulling) which may include special skills (e.g., boxing, karate, and judo) but do not include the use of *deadly force* or any authorized/other weapon.

*Probable cause:* The total set of apparent facts and circumstances in which a reasonable person may believe that a crime has been committed and the person proposed to be detained had something to do with the commission of that crime.

*Serious bodily injury:* Harm that creates substantial risk of death, serious permanent disfigurement, or loss or impairment of any body function or organ.

## PROCEDURES:

Levels of Use of Force:

Use of force or deadly force is controlled by the basic elements of *a reasonable Officer=s perception* and a *reasonable Officer=s response*. Officers will use only the level of force that is reasonably necessary to stop the perceived threat.

> ***Compliant**:* The appropriate level of response is *cooperative controls,* including *Officer presence, hand signals, verbal commands and instructions,* light touching or *patting,* etc. In other words cooperation at this level is a *two way street*.

***Passively Resistant:*** *The* appropriate level of response is *contact controls,* including *strong or forceful soft hand, hand and arm holds, pressured physical movement of the suspect, removal,* etc.

***Actively resistant:*** *The* appropriate response is *compliance techniques.* This is the threshold for any reasonable Officer to consider this suspect to be a potential threat to himself, the Officer or other citizens. Compliance techniques may include *all reasonable* means to cause the *suspect to comply as soon as reasonably possible.* These techniques may include *use of chemical weapons, electronic weapons, use of restraints, forced movement, forcing a suspect=s limbs behind his back, forcing a suspect down on the floor or against a wall, or using other forms of rough physical force,* etc. Once suspects are perceived as actively *resistant*, Officers should not relax care until the subject is fully secured.

**Assaultive *B and a threat to bodily harm:*** The appropriate level of response is immediate *defensive tactics.* The original assaultive behavior may have been directed at a fellow suspect, apparent victim or the Officer. *Defensive tactics* may include *impact weapons, hard fist, or any other reasonable means available* and at hand to stop the aggression, defend against the attack, and bring the suspect into compliance. It is contemplated and understood that reasonable Officers, while employing defensive tactics, may cause injury, serious injury, and in some isolated instances, death without intending such consequences.

***Assaultive B serious bodily harm or death:*** The appropriate level of response is *deadly force.* Deadly force includes firearms, knives, or any other means immediately available that a reasonable Officer, in the same circumstance, would consider as potentially causing death or serious bodily injury.

It is important to remember that almost all incidents faced by police are not scripted, easy to understand, or predictable as to outcome. Officers will use their best effort to determine the threat and apply the corresponding response. Time permitting, Officers must use care in evaluating a suspect=s actions and perceived threat. If there is reasonable doubt and time permits, seek assistance before acting. Justification for the use of force and deadly force must be limited to what is *known or reasonably perceived* by the Officer at the time of the incident. Facts unknown at the time force is used should not be considered later to determine whether the force was justified (MSLEAC 1.3.2).

Officers will not intentionally use more force than is necessary and reasonable under the circumstances. Officers will never use force in response to mere verbal provocative or abusive language directed at the Officer. Officers must never use deadly force except to protect their life or the life of other human beings (MSLEAC 1.3.2).

**Application of Use of Force and Deadly Force:**
Application of *deadly force* and *force* are authorized by an Officer only to achieve the following lawful objectives (MSLEAC 1.3.2):

1. To defend himself or others against serious threats of serious bodily injury or death.
2. To stop dangerous felony flight where there is serious imminent risk to the public of death or serious bodily injury.
3. To prevent roaming at large by obviously mad or vicious animals.

Application of *force* but not *deadly force* is authorized by an Officer only to achieve the following lawful objectives:

1. To preserve the peace.
2. To defend themselves or others against unlawful violence.
3. To prevent the commission of self-inflicted injury or suicide by any person.
4. To make lawful arrests or searches; to overcome resistance to such arrests or searches; and to prevent escape from custody.
5. To prevent or interrupt an intrusion on or interference with the lawful possession of property.
6. To prevent roaming at large by obviously mad or vicious animals.

Before using any force against a suspect, **time permitting**, Officers will:

1. Have *probable cause* to arrest that suspect;
2. State his intentions to arrest and identify himself as a Officer; and
3. State the reason for the arrest.

The amount and degree of force Officers may use to achieve an objective takes into consideration the following possible issues, if time and circumstances allow:

1. Nature and seriousness of the original offense committed by the suspect.
2. Nature and seriousness of the risk of injury to the Officer or others.
3. Age, physical condition, and behavior of the suspect.
4. Relevant actions by any third parties.
5. Physical conditions (e.g., visibility) at the scene.
6. Feasibility and availability of alternative actions.
7. Opportunity and actual ability of the suspect to injure the Officer, himself, or others.

Before Officers use force (but not deadly force) for the purpose of protecting a person from self-inflicted bodily injury [suicide attempt] or from uncontrollable circumstances, the Officer will consider other available alternatives to protect that person from harm.

Officers may use unauthorized objects as weapons or use weapons in unauthorized manners if emergency circumstances make it necessary to protect human life and prevent serious injury.

Officers may draw and ready any authorized weapons for use only when they reasonably anticipate that they may have to use such weapon(s).  This does not require Officers to use the weapons.

Following the application of force, appropriate medical aid will be rendered to the subject (MSLEAC 1.3.5).

**Use of Non-Deadly (Less-than-Lethal) Force** (MSLEAC 1.3.4)**:**

Officers will use physical strength and skill, restraint devices and techniques, chemical weapons, electronic weapons or impact weapons to apply non-deadly force only.

Officers have no obligation to *retreat* or *back down* before resorting to approved use of force, including deadly force. Officers may consider retreat or withdrawal where delay could make a more peaceable arrest or stop likely if such tactics would not increase risk to the Officer or others.   In some cases, an increased show of force may reduce the amount of force necessary to accomplish the Officer=s objective.

Officers will not attempt to affect arrests alone if there is substantial risk to himself from the arrestee or another party unless there are no available reasonable alternatives.

Officers will use handcuffs or other restraining devices on all arrestees unless it is obviously unnecessary or impractical (e.g. the elderly, young juveniles, amputees, crippled, injured, or other applicable subjects).  Officers will take reasonable precautions to protect arrestees from injury caused by handcuffs or other restraining devices.  Recognizing that there may be extreme exceptions to the use of approved restraint devices, generally only restraining devices and techniques approved by the department may be used.

Officers may use chemical weapons and electronic weapons for self-protection or to subdue persons unlawfully resisting arrest.  Any person on which a chemical weapon has been used will be treated or decontaminated for exposure to the chemical agent as soon as practical and thereafter monitored for possible latent effects.  Any person on which an electronic weapon has been used will receive medical treatment if warranted as soon as practical (MSLEAC 1.3.5).

Officers may use impact weapons to protect him or another from assault or to arrest a person who unlawfully and violently resists arrest if lesser methods have failed or if circumstances warrant the immediate use of the impact weapon. However, Officers should:

1. Avoid baton blows that are capable of inflicting serious bodily injury;
2. Deliver only short snappy body blows to vulnerable areas in order to temporarily incapacitate subjects.

**Use of Deadly Force:**

Deadly force may not be used under the following circumstances:

1. As a warning or threat (i.e. warning shots)( MSLEAC 1.3.3).
2. With the intent to maim or cripple a person.
3. On a person who has not caused or threatened to cause serious bodily injury or death to another person, including the Officer.
4. On a person who simply flees or evades arrest.
5. Merely to prevent the destruction or theft of property.
6. When the Officer has some doubt as to the justification for using deadly force.

**Reporting the Use of Force:**

Officers who discharge firearms or who use chemical weapons, electronic weapons, impact weapons, special weapons, or who cause bodily injury or death to other persons by use of force or deadly force will notify their direct supervisor immediately.

In incidents where Officers cause serious bodily injury or death through the application of deadly force, they will: first call for medical assistance; then secure the scene as well as possible; then notify their direct supervisor.

Upon arrival, the supervisor will take charge of the scene along with any investigation concerning the incident and report the incident to the agency's Chief Officer or his/her designee; who may then request an outside agency to conduct the investigation. In incidents involving the use of force, all Officers will assist in every way possible with the investigation whether conducted by this or an outside agency.

The agency's Chief Officer or his/her designee will review any report generated by this policy in an effort to:

1. Protect the integrity of the facts and the evidence;
2. Ensure that the Officer's use of force complied with all appropriate state and federal laws and department policy;
3. Determine if the Officer's use of force indicates a need for special counseling, training, or disciplinary action; and
4. Determine whether the situation requires further action.

**Reporting Requirements:**

The agency's Chief Officer or his designee will be notified immediately when any type of force is used and there is resulting *serious physical injuries or death.*

A written report shall be completed by the Officer(s) whenever he/she:

1. discharges a firearm, for other than training or recreational purposes;
2. takes an action that results in or is alleged to have resulted in injury or death to another person;
3. applies force through the use of lethal or less-than-lethal weapons; or
4. applies weaponless physical force at a level as defined by the agency. (MSLEAC 1.3.6)

Each Officer who witnessed the incident or responded to the scene will also complete a written report. These witness reports will be submitted to the agency's Chief Officer or his designee for review (MSLEAC 1.3.7).

The Officer(s) who actually used or employed the deadly force will be removed from line duty assignment pending administrative review (MSLEAC 1.3.8). The Officer's weapon(s) will be collected and tagged as evidence. A substitute weapon will be issued the Officer(s) at the discretion of the agency's Chief Officer. The agency's Chief Officer or next senior supervisor at the scene will instruct the Officer(s) who used deadly force to:

1. Refrain from making any statements to the news media, other Officers or supervisors;
2. Refrain from discussing the matter between Officers or witnesses [if more than one Officer];
3. Return to or be transported directly to the station; and
4. Refrain from completing any reports or statements for at least twelve [12] hours.

When the Officer arrives at the station investigators will debrief the Officer(s) and advise the agency's Chief Officer or his designee of their preliminary findings. The Officer(s) will be placed on administrative leave. Thereafter, the Officer(s) will be transported home. The next day, at the station, the Officer(s) involved in the deadly force incident will complete his/her report and make all required statements. The Officer(s) will provide all required information as if a witness to the incident, providing his/her first-hand *perception of events* at the time and the *corresponding force options used*.

All reports completed by the Officer(s) using force, other Officers or witnesses will include the following:

1. A description of the events leading to the use of force or deadly force;
2. The original offense or *probable cause* for the stop or action;
3. An accurate description of the incident and reasons for employing force;
4. A description of the weapon or device used and the manner in which it was used;
5. A description of the injuries suffered, and the treatment given or received;
6. A list of all participants and witnesses to the incident; and
7. A copy of all incident reports compiled as a result of the incident.

**Weapons Control & Issue** (MSLEAC 1.3.9)**:**

Officers will register all firearms carried on-duty or off-duty with the department, and will only carry or use authorized duty weapons, firearms and ammunition under these standards:

1. Firearm is registered with the department.
2. Specific firearm and ammunition *type* and *caliber* are approved for use by the agency's Chief Officer or his designee.
3. Firearms have been inspected and deemed safe by the department's firearms instructor(s).
4. The Officer has demonstrated proficiency and been certified in the last six [6] months in the use of all weapons and ammunition he/she carries both on-duty and off-duty.
5. Officer qualifies with the same weapon and type of ammunition [caliber, bullet weight, bullet design, and powder load] actually carried on duty.
6. If a different firearm is carried off-duty, the conditions of 1-5 above apply to the officer's off-duty weapon(s).

Officers may not modify or alter an authorized weapon in any material way without departmental approval.

**Firearms & Weapons Certification** (MSLEAC 1.3.10)**:**

The Firearms & Weapons Instructor(s) will qualify all Officers in the use of their primary and secondary firearms as well as any off-duty firearms and other weapons carried in the performance of their official duties. Certification for all weapons [*firearms, chemical agents, special munitions delivery systems*, etc.] authorized and carried by department Officers will be conducted on a regular basis (MSLEAC 1.3.9,10,11). For further detail on weapons qualifications refer to the department's firearms training and qualification policy (MSLEAC 1.3.9,10,11).

Under no circumstance will Officers who are not certified with their respective weapons be allowed to carry those particular weapons.

**Allegations Against Staff:**

The agency's Chief Officer or his designee will investigate all allegations of improper use of force & deadly force by Officers and employees of this department. In cases where possible criminal acts are involved, the appropriate law enforcement agency or prosecutor's office will be notified.

**Policy Adoption:**

It is hereby agreed that this document is not to be construed as an interlocal agreement, but merely an agreement between the below listed agency heads to present said document to their respective boards for consideration. Each individual agency/board is free to adopt and/or amend this policy as their individual needs direct.

## Use of Force Chart



**Rankin County Adult Detention Center**
**Policies and Procedures**

| **Subject:** Inmate Medical Services | **Policy Number:** 11.1 |
|---|---|
| **Issue Date: March, 2005** | **Revision Date: December, 2011** |
| **Approval Authority: Bryan Bailey, Sheriff** | |

**POLICY:**

The Rankin County ADC will provide medical evaluation and treatment and housing for inmates who display or have been diagnosed as having medical problems. In such cases, medical care will be provided on a reasonable and cost-effective basis, consistent with the facilities that are available.

**PENOLOGICAL INTEREST:**

It is in the penological interest of this detention facility to provide reasonable and necessary security and safety standards, control, supervision, and oversight of those inmates with medical or health problems while confined to this facility.

**PROCEDURE:**

The Rankin County ADC will reasonably provide medical services to inmates as circumstances dictate, and as deemed necessary by the visiting physician. In providing these medical services, the custody and control of the inmate will not be neglected or relaxed.

Inmates have a right to refuse routine medical attention and there will be no involuntary administration of psychotropic medications to inmates. All refusals will be documented.

Students and/or interns will not be used in the facility to provide inmate care.

**Initial Intake Evaluation:**

1. Any inmate brought into the facility will be medically evaluated before being accepted into the facility.
2. Arriving detainees determined to be in need of critical or emergency medical, mental, or dental care, will not be accepted into the facility, and will remain in the custody of the arresting or transporting officer.
3. During the initial contact, the jail officer will ask the inmate, *are you ill; are you injured; are you under critical medical care?*

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

4. If he or she answers *yes* to any of these questions, or there is good reason to suspect that critical care is indicated, the individual will not be accepted.
5. Facility staff may recommend that transporting or arresting officers transport their inmate to the nearest medical, mental or dental facility for treatment.
6. Detainees showing signs or known to be mentally incompetent will not be accepted.
7. Before the booking process is completed, personnel will complete a medical screening of the inmate.
8. Inmates who claim to be infected with a communicable disease will be medically isolated from the general population pending medical evaluation and review.
9. Reasonable efforts will be made to acquire professional assistance in processing individuals with special disabilities. If qualified professionals are available, they will be summoned to assist in the admissions process.
10. Observation and evaluation of the physical and mental condition of inmates will continue through each phase of intake, including searches, and/or showers.
11. Medical alert tags worn by the inmate will be noted on the medical and book-in sheets. The inmate will be allowed to wear the medical alert tag.

**Sick Call:**
Inmates identified as requiring examination or treatment by a physician will be scheduled for the next sick call. Sick call will be conducted on a schedule as determined by the Jail Administrator. Refer to the *Sick Call* policy 11.2.

**Emergency Health Care and First Aid:**
The facility will maintain at lease one fully stocked first aid kit at the facility that is accessible to officers. At least one officer per shift will be trained in emergency first aid by an appropriate authority, and be able to demonstrate skill in the rendering first aid to inmates and fellow officers in the event of a medical emergency. With the advent of a medical emergency, the responding officer that is first aid qualified will:

1. Assist the injured person(s), and instruct other officers to call for professional medical assistance, as needed.
2. Isolate or remove the injured party to a secure and safe area, if the injuries allow movement.
3. Provide basic first aid to the injured party. The level of care will normally include: stop the bleeding, protect the wound, and treat for shock.
4. Make the injured party as comfortable as possible until other medical help arrives.
5. Provide security for the injured party until help arrives.
6. Refer to *Medical Emergency* policy 7.7.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

**Active Labor/Childbirth:**
Generally, females near time for childbirth will not be housed in the facility. The court will be contacted and arrangements sought to release the female by bond reduction, house arrest, or other method as directed by the court.

Restraints will not be used on female inmates during active labor and the delivery of a child. Any deviation from this policy requires approval by, and guidance on, methodology from the Medical Director. The medical authority shall provide guidance based on documented serious security risks. Medical will provide guidance on the use of restraints on pregnant offenders prior to active labor and delivery.

**Medication:**
All medications will be confiscated from the inmate during admission and kept in a secure location in the facility to ensure:

1. All medications will be reviewed by the provider of medical services;
2. Medications will be given only by a physician's orders;
3. Issuance of medication only by a physician's written orders, including controlled drugs and injections;
4. An established receipt system for issuance of medication to the inmate; and
5. A responsible officer will distribute the medication to the inmates as directed.

**Health Appraisal Evaluation:**
The health appraisal will begin with a review of each inmate's intake form. Significant past or present health problems or health maintenance needs will be reviewed, and referred to a physician in a manner consistent with findings.

1. Significant findings will be annotated and elaborated upon in the medical record, and additional health care services may be initiated as directed by the physician.
2. If abnormal health conditions are disclosed during the health appraisal, the inmate will be referred to medical professionals. Personnel performing the health appraisal should be attentive to the personal, social, and offense circumstances of each inmate.
3. Inmates whose circumstances are generally known to be related to risk of infestation, contagious disease, or generally poor health will be identified and referred to a physician who will determine if laboratory or diagnostic tests for communicable diseases are indicated.
4. The physician will establish and maintain standing orders identifying groups with high risks of communicable disease, which should include specifications on diagnostic tests to be performed, standard treatment regimens, and housing recommendations.
5. In the event a communicable disease is detected, the physician and shift supervisor on duty are to be notified.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

6. Inmates with communicable diseases will be assigned in appropriate separation facilities [single cell] of Rankin County ADC or a medical facility.

**Classification:**

1. Upon completion of the booking process, inmates will be referred to the classification officer for housing and other facility activities or programs. The same officer may perform the job functions of booking and classification.
2. The classification officer will be notified of any medical condition, ailment, or illness that could seriously effect the classification of the inmate.
3. Inmates found to be in good physical and mental health will be assigned to housing according to standard classification criteria.
4. Where and when reasonably possible, inmates with physical and mental health conditions will have their conditions considered as a part of the classification process. However, these conditions will not override security considerations.

**Examination:**

Physical examinations will be provided to all inmates at the facility within fourteen [14] day of booking, unless there is documented evidence of a comparable examination within the previous ninety-days [90]. The examination may include the following:

1. Review of intake screening;
2. Recording of height, weight, pulse, blood pressure, and temperature;
3. Collection of additional data to complete the medical, dental, mental health, and immunization inquiries;
4. Laboratory and/or diagnostic testing or tests to detect communicable diseases, including venereal disease and tuberculosis;
5. Other tests and examinations as appropriate or indicated by medical examination, including review of mental and dental status;
6. Development and implementation of a treatment plan, including recommendations concerning housing, job assignment, and program participation.
7. The examining physician may record his examination findings, diagnosis, and recommended treatment in the inmate's medical record along with any prescription of medicines, including drug name, strength, frequency of administration, and the duration of treatment should be included in the record.
8. After examination and treatment, the inmate will be escorted back to his cell or temporary holding tank.
9. Inmates being examined by medical personnel of the opposite sex will have, if available, an officer of the same gender as the inmate present during the examination.
10. Qualified jail personnel will visit inmates requiring medical attention, daily, to render treatment and dispense medications as prescribed by a physician.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

**Medical Instruments/Supplies:**
The Medical Staff shall ensure that all medical and dental instruments and supplies are controlled and inventoried according to protocol.

**Use of Inmates for Medical Care:**
Inmates shall not be assigned health care related tasks of any kind, including: performing direct inmate care services; scheduling health care appointments; determining access of other inmates to health care services; handling or having access to surgical instruments, syringes, needles, medications or medical records; or operating any diagnostic or treatment equipment.

**Inmate Injury Prevention:**
The Jail Administrator will analyze serious inmate injuries occurring within the facility at least annually. He shall identify problems and develop and implement corrective actions to prevent or minimize the occurrence of said injuries in the future. He shall report the numbers of serious inmate injuries and the corrective actions taken as a result of said injuries to the Sheriff annually.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

**Rankin County Adult Detention Center**
**Policies and Procedures**

| **Subject:** Sick Call | **Policy Number:** 11.2 |
|---|---|
| **Issue Date: June, 2009** | **Revision Date:** |
| **Approval Authority: Bryan Bailey, Sheriff** | |

## POLICY:

It is the policy of the Rankin County ADC to provide each inmate with regular access to health care services from a qualified provider to screen, refer, and provide basic treatment for ongoing or emerging health care problems.

## PENOLOGICAL INTEREST:

It is in the penological interest of this detention facility to provide reasonable and necessary medical care, security and safety standards, control, supervision, and oversight of inmates while confined to this facility.

## PROCEDURE:

Sick call is an organized method of treating inmate health problems through a regularly scheduled open house. Sick call provides inmates with the opportunity to report a medical illness or other health problem, and to receive diagnosis or treatment to alleviate the condition, if reasonably possible.

**Scheduling:**
Inmate medical complaints are solicited daily through a request slip or form system, acted on by staff personnel, and followed by appropriate triage and treatment by qualified personnel.

Sick call will be scheduled on a regular basis, and the schedule may change from time to time to meet the penalogical interests of the facility. Inmates will be advised of the date and times for sick call. A physician, physician's assistant, or nurse will be accessible to general population inmates, and conduct sick call on an established schedule. The person conducting the sick call will, if reasonably possible:

1. Examine the inmate to the extent required to ascertain the nature of the problem;
2. Provide appropriate treatment;
3. Schedule the inmate for further examination or treatment; and

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.

4. Refer the inmate for transfer to the facility clinic or appropriate hospital when necessary.
5. Arrange for immediate transfer to appropriate facility, clinic, or hospital in medical emergencies.

**Process:**

A member of the facility staff may assist the sick call officer with inmate control and scheduling. The staff member conducting the sick call, or the assisting officer, will maintain sick call records.

**Review of Sick Call:**

A physician will review sick call requests and records on a regular basis. Reviews may include:

1. An examination of records;
2. Referrals made by the sick call personnel;
3. Discussion with the staff member who conducted sick call; and
4. Actual examination of the inmate, if necessary.

**RESTRICTED LAW ENFORCEMENT DATA**
This data is proprietary and shall not be duplicated, disclosed, or discussed, without the written permission of this agency. Data subject to this restriction is contained throughout this publication.